## UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF WISCONSIN

In Re:

**GREDE FOUNDRIES, INC.,**                                    **Case No. 09-14337**

                        **Debtor**                                    **Chapter 11**

                                                              **Hon. Robert D. Martin**

### DEBTOR'S MOTION FOR INTERIM AND FINAL ORDERS (A) AUTHORIZING DEBTOR TO (i) USE CASH COLLATERAL PENDING A FINAL HEARING; (ii) INCUR POST-PETITION DEBT PENDING A FINAL HEARING; (iii) GRANT ADEQUATE PROTECTION AND PROVIDE SECURITY AND OTHER RELIEF TO AGENTS AND LENDERS; AND (B) SCHEDULING A FINAL HEARING AND ESTABLISHING RELATED NOTICE REQUIREMENTS

Grede Foundries, Inc., debtor and debtor-in-possession (the "Debtor"), hereby submits this Motion (the "Motion") for the entry of an order (A) Authorizing the Debtor to (i) Use Cash Collateral Pending a Final Hearing; (ii) Incur Post-Petition Debt Pending a Final Hearing; (iii) Grant Adequate Protection and Provide Security and Other Relief to GE Business Financial Services Inc. ("GE"), in its capacity as administrative agent (the "Pre-Petition First Lien Agent") to the lenders (the "Pre-Petition First Lien Lenders") party to the Pre-Petition First Lien Credit Agreement (the "Pre-Petition First Lien Credit Agreement"), DDJ Capital Management, LLC, ("DDJ") as administrative agent (the "Pre-Petition Second Lien Agent;" and, together with the Pre-Petition First Lien Lenders, the "Pre-Petition Lenders"), and GE, in its capacity as agent (the "Post-Petition Agent;" and, together with the Pre-Petition Agent, the "Agents") to the lenders (the "Post-Petition Lenders;" and, together with the Pre-Petition Lenders, the "Lenders") party to the Post-Petition Credit Agreement (the "Post-Petition Credit Agreement") and (B) Scheduling a Final Hearing and Establishing Related Notice Requirements.

In support of this Motion, the Debtor respectfully states as follows:

## Jurisdiction

1.      The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue of this proceeding is proper in this District and before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The bases for the relief requested are sections 361, 363 and 364 of the United States Code (the "Bankruptcy Code"), and Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## Background

3.      On June 30, 2009 (the "Petition Date"), the Debtor commenced its reorganization case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

4.      The Debtor is continuing in possession of its property and is operating and managing its business as a debtor-in-possession, pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No request has been made for the appointment of a trustee or an examiner, and no official committee has been established.

5.      The Debtor is a high quality producer of ductile iron, grey iron and specialty metal parts.  The Debtor serves the automotive, heavy truck, off-highway, diesel engine and industrial markets and is one of the largest cast-iron foundry companies in the United States. The Debtor is a Wisconsin Corporation currently employing approximately 1,635 people in eight facilities located in Wisconsin, Michigan, Minnesota, Indiana, Kansas and South Carolina, with an additional 770 employees on lay-off.

2

6.      For a detailed history and description of the Debtor and its operations, the Debtor

respectfully refers the Court and the parties in interest to the *Affidavit of Joan Wier in Support of*

*First Day Pleadings* (the "Wier Affidavit") filed contemporaneously herewith, and incorporated

herein by reference.

### Summary of Relief Requested

7.      By this Motion, the Debtor respectfully seeks an interim order substantially in the

form attached hereto as Exhibit A (the "Interim Order") as follows:[1]

(a)      authorizing, on an interim and permanent basis, the Debtor to:

(i)      pursuant to sections 364(c), (d) and (e) of the Bankruptcy Code,
enter into a new Post-Petition Credit Agreement (the "DIP
Facility") with GE, as administrative agent, Bank of America,
N.A., M&I Marshall & Ilsley Bank, and Wayzata Opportunity
Fund II, L.P., based upon the form of Pre-Petition First Lien Credit
Agreement dated as of October 27, 2006, by and between the
Debtor, GE, as administrative agent, and the Pre-Petition First Lien
Lenders, providing for (A) new Revolving Loans in an amount not
to exceed the amount of repayment of the Prepetition Revolving
Loans, (B) a Term Loan to refinance the Prepetition Term Loan,
and (C) incremental funds provided by Wayzata as described in
clause (ii) below; a copy of the Post-Petition Credit Agreement is
attached hereto as "Exhibit B");

(ii)     borrow the lesser of (i) the $10,000,000 initial Delayed Draw Term
Loan plus the amount of cash collateral applied to repay the Pre-
Petition Revolving Loans, and (ii) the Approved Budget
disbursements for the first 30 days, to provide the Debtor with an
effective safety net for this initial period;

(iii)    grant to the Post-Petition Lenders, (A) pursuant to sections
364(c)(2), (c)(3) and (d) of the Bankruptcy Code, as security for
repayment of all obligations arising under the Post-Petition Credit
Agreement, security interests in and liens on substantially all assets
of the Debtor, in accordance with the Post-Petition Credit
Agreement, subject to (i) the Carveout (as defined below) and (ii)
the liens and security interests securing the Debtor's pre-petition

---

[1] All capitalized terms not otherwise defined herein will have the meanings given such terms in the Post-Petition
Credit Agreement attached hereto as Exhibit B.

indebtedness under the Pre-Petition First Lien Credit Agreement, which Pre-Petition First Liens shall be secured equally and ratably with the DIP Liens; and (B) superpriority administrative expense claim status pursuant to sections 364(c), 503(b) and 507 of the Bankruptcy Code, subject to the Carveout and certain other claims as more fully described below and in the Interim Order;

(b)     pursuant to sections 361, 363(c)(2) and 363(e) of the Bankruptcy Code, authorizing the Debtor to use Pre-Petition Collateral, including Cash Collateral (each as defined in the Interim Order), and to provide adequate protection to the Pre-Petition First Lien Lenders, and to the Pre-Petition Second Lien Lenders who extended credit to the Debtor under that certain Second Lien Credit Agreement dated as of October 27, 2006 (the "Second Lien Credit Agreement") with respect to any diminution in value of their respective interests in the Pre-Petition Collateral resulting from the implementation of the Post-Petition Credit Agreement, the use, sale or lease of the Pre-Petition Collateral or the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code subject to, in the case of the Pre-Petition Second Lien Lenders, the subordination provisions contained in that certain Intercreditor Agreement dated as of October 27, 2006 (the "Intercreditor Agreement") by and between the Pre-Petition First Lien Lenders and the Pre-Petition Second Lien Lenders;

(c)     approving the terms and conditions of the Post-Petition Credit Agreement and the documents to be executed in connection therewith, and authorizing the Debtor to execute and deliver, from time to time, all such documents, instruments and agreements and perform such other acts as may be required, necessary or desirable in connection with the Post-Petition Credit Agreement including, without limitation, the payment of all fees, interest and charges required under the Post-Petition Credit Agreement;

(d)     authorizing the Debtor, after entry of the Final Order, to borrow funds under the DIP Facility to (i) repay a portion of the "Pre-Petition First Lien Debt" (as defined in the Interim Order) such that, after taking into account the payment of Pre-Petition First Lien Debt pending entry of the Final Order, the aggregate outstanding principal amount of the Pre-Petition First Lien Debt has been repaid in the amount of $27,000,000 (consisting of the assumption or cash collateralization of approximately $11,565,000 in outstanding letters of credit and repayment of not less than $15,451,000 of Revolving Loans), plus accrued and accruing interest, fees, costs and other charges, under the Pre-Petition First Lien Credit Agreement and (ii) fund the Debtor's working capital needs and for other purposes as provided in the Post-Petition Credit Agreement, in accordance with the Approved Budget;

(e)     modifying the automatic stay under section 362 of the Bankruptcy Code to the extent necessary to permit the Post-Petition Lenders to implement the

WHD/6545410.14

terms and other provisions of the Post-Petition Credit Agreement and the DIP Financing Order; and

(f)      scheduling and approving the form and manner of notice of the Final Hearing.

**<u>Summary of the Debtor's Pre-Petition Financing</u>**

8.      On October 27, 2006, the Debtor entered into a Credit Agreement with GE, as Administrative Agent for the Pre-Petition First Lien Lenders.

9.      On October 27, 2006, the Debtor entered into a Second Lien Credit Agreement with DDJ, as Administrative Agent for the Pre-Petition Second Lien Lenders.

10.      As collateral security for Debtor's obligations to the Pre-Petition First Lien Lenders, the Debtor granted a first priority lien on essentially all of Debtor's business properties, both real and personal to the Pre-Petition First Lien Agent, for the benefit of the Pre-Petition First Lien Lenders.  In this regard, the Pre-Petition First Lien Lenders are provided first priority security interests in cash, accounts and deposit accounts, and the proceeds thereof (collectively, "<u>Cash Collateral</u>"), and in intangibles, inventory, work in process, equipment, machinery and fixtures, a copyright, stock in Debtor's subsidiaries and a note from an affiliate of Debtor ("<u>Other Personal Property Collateral</u>").  The Pre-Petition First Lien Lenders are also provided collateral security in the form of eight first priority real estate mortgages on Debtor's facilities ("<u>Real Estate Collateral</u>") and guaranties issued by each of Debtor's subsidiaries ("<u>Guaranties</u>").  The Cash Collateral, Other Personal Property Collateral, Real Estate Collateral and Guaranties are collectively referred to herein as the "<u>Pre-Petition Collateral</u>."

11.      The Pre-Petition Second Lien Credit Agreement provides a term credit facility to the Debtor.  To secure its obligations under the Pre-Petition Second Lien Credit Agreement, the Debtor granted the Pre-Petition Second Lien Lenders a junior security interest in the Pre-Petition Collateral, including the Cash Collateral.

WHD/6545410.14

12.     While the Interim Order preserves a right to challenge the extent, validity, perfection, priority or enforceability of the Pre-Petition Liens or any other claims or causes of action against the Pre-Petition Lenders, the Debtor is currently unaware of any grounds for such contest and, therefore, does not challenge the extent, validity, perfection, priority or enforceability of the Pre-Petition Liens for purposes of this Motion.[2]

13.     As of the Petition Date, the gross amount of the Debtor's accounts receivable was approximately $48.3 million and the Debtor had approximately $3 million in cash at the M&I Marshall & Ilsley Bank ("M&I").

14.     As of the Petition Date, the total obligations under the Pre-Petition First Lien Credit Agreement were approximately $36.7 million[3], and the total obligations under the Pre-Petition Second Lien Credit Agreement were approximately $20.6 million.

15.     As of the Petition Date, the value of the Pre-Petition Collateral is not less than $40 million.

16.     As set forth in the Debtor's Motion for Authority to Maintain Its Bank Accounts and to Continue to Use Its Business Forms and Its Cash Management Systems, essentially all of

---

[2] In analyzing the Pre-Petition Liens, the Debtor reviewed the following:

(i)   Title policies issued by Chicago Title Insurance Company with respect to the properties listed on Schedule 3.20 to the Pre-Petition First Lien Credit Agreement at the time of the closing of the Pre-Petition First Lien Debt, insuring that the mortgages securing the Pre-Petition First Lien Debt are superior to the mortgages securing the Pre-Petition Second Lie Debt and all other matters as of the date of issuance of each such policy except as shown therein.  The Debtor's property in Kentucky shown on such Schedule is no longer owned by the Debtor;

(ii)  A UCC search of the Wisconsin Department of Financial Institutions under date of June 1, 2009, which shows that the filing of the Pre-Petition First Lien Lenders is the only "all asset" filing other than the similar filing of the Pre-Petition Second Lien Lenders, that the security interest of the Pre-Petition First Lien Lenders is prior to that of the Pre-Petition Second Lien Lenders, and that the only other security interests or purported interests are those described on the attached list.  The Debtor did not review (a) records relating to collateral for which the method of granting security interests or perfecting those security interests is not governed by the Uniform Commercial Code or by real estate mortgages, or (b) records relating to the collateral described in (i) and (ii) above covering time periods after the dates described above.

[3] The Pre-Petition First Lien Debt consists of Revolver Borrowings of $15,451,198.38, the Term Loan in the amount of $9,725,692.34, and outstanding letters of credit in the amount of $11,565,000.

the Debtor's business income generated by its operations is deposited in a collection account maintained at M&I, swept daily and applied against the obligations under the Pre-Petition First Lien Credit Agreement.

17.     The Debtor maintains a Disbursement account with sub-accounts for general disbursements, payroll and healthcare payments to employees.  The Disbursement account is funded by advances from the Pre-Petition First Lien Lenders and is the source for payment of all the Debtor's operating expenses.

18.     The Pre-Petition First Lien Lenders exercised their rights under the Pre-Petition First Lien Credit Agreement to sweep the collection account each day and apply the funds on deposit to Debtor's loan obligations to GE, as Pre-Petition First Lien Agent.  The Debtor has no access to Cash Collateral and no access to operating funds other than through advances to the Disbursement Account made by the Pre-Petition First Lien Lenders in their sole discretion, under the Pre-Petition First Lien Credit Agreement.  Such advances recently and currently do not meet Debtor's operating needs.

### The Proposed DIP Facility

19.     The Debtor determined, in the exercise of its sound business judgment, that it requires postpetition financing to meet its ongoing working capital and general business needs, and that the terms of the Post-Petition Credit Agreement will reasonably address the Debtor's financing requirements and constitutes the best alternative available under the circumstances. Accordingly, subject to the Court's approval, the Debtor chose to enter into the Post-Petition

7

Credit Agreement with the Post-Petition Lenders. The principal terms of the Post-Petition Credit

Agreement are summarized below.[4]

1.  **Borrower.**  The Borrower shall be the Debtor, Grede Foundries, Inc.

2.  **Guarantors.**  Each direct and indirect domestic subsidiary of Borrower shall be a Guarantor.  Borrower shall also provide a pledge of 100% of all equity interest in all Guarantors.  Borrower shall provide a pledge of 65% of all equity interests in its direct and indirect non-domestic subsidiaries.

3.  **Lenders.**  The Post-Petition Lenders shall be the Pre-Petition First Lien Lenders, and Wayzata Opportunities Fund II, L.P., a fund managed by Wayzata Investment Partners LLC ("Wayzata").  Certain other Persons constituting "Eligible Assignees" could become Lenders on the terms and conditions set forth in the Post-Petition Credit Agreement.

4.  **Requested Amount of Loan and Use of Proceeds.**  The total principal amount of the requested loan will be approximately $54,975,000, consisting of (i) $45,000,000 of new credit supplied by Wayzata (the "Wayzata Commitment") and (ii) approximately $9,250,000 from the Pre-Petition First Lien Lenders.  Until entry of the Final Order, the existing loans from the Pre-Petition First Lien Lenders will stay in place and the Debtor will have the ability to draw up to $10,000,000 on the Wayzata Commitment as further described in Paragraph 6 below.  The remaining $35 million of the Wayzata Commitment will become available upon entry of the Final Order with the Debtor being required to use such portion of the remaining $35 million Wayzata Commitment as is necessary to repay the Debtor's Pre-Petition Revolving Loan obligations to the Pre-Petition First Lien Lenders.  The amount of this repayment is expected to be approximately $27,016,000, but may vary due to adjustments, customary charges and repayments prior to the entry of the Final Order.

5.  **Roll-Up of Prepetition Loans.**  The Term Loans in the approximate amount of $9,725,000 under the Pre-Petition First Lien Credit Agreement shall be rolled-up into the Post-Petition Credit Agreement upon entry of the Final Order.  The Term Loans shall become term loans under the Post-Petition Credit Agreement and be *pari passu* with all funds advanced pursuant to the Wayzata Commitment.  All cash collateral shall be applied to repay the Pre-Petition Revolving Loans; provided, however, that to the extent of such repayment the Pre-Petition Lenders under the Pre-Petition Credit Agreement shall, as lenders, lend a like amount as loans under the DIP Facility subject to the Approved Budget, on a *pari passu*

---

[4] This summary of the Post-Petition Credit Agreement is intended only to assist the Court and interested parties in reviewing the key aspects of the arrangement and is qualified in its entirety by reference to the Post-Petition Credit Agreement, as it may be modified by the proposed Interim Order and the Final Order.  All capitalized terms not otherwise defined herein have the meanings given to them in the Post-Petition Credit Agreement or the proposed Interim Order.

WHD/6545410.14

basis with all other funds advanced pursuant to the Wayzata Commitment (the "<u>Rolled-Up Pre-Petition Revolving Loans</u>").

6. **Bankruptcy Court Approval.** No portion of the DIP Facility shall be available prior to the Bankruptcy Court's entry of an interim order (the "<u>Interim Order</u>") approving the DIP Facility. The Interim Order shall be in a form and substance acceptable to Post-Petition Lenders and Pre-Petition First Lien Lenders. Upon entry of the Interim Order, Borrower shall make an initial draw of $10,000,000 under the Wayzata Commitment (the "<u>Interim Draw</u>"). The remaining portion of the Wayzata Commitment, $35,000,000 shall not be made available unless and until the Bankruptcy Court enters a final, non-appealable order (the "<u>Final Order</u>") approving the DIP Facility. The Final Order shall be in a form and substance acceptable to Post-Petition Lenders and the Pre-Petition First Lien Lenders. The Final Order shall be entered no later than the 30th day after the commencement of this case. Within one business day after entry of the Final Order, subject to the terms and conditions of the Post-Petition Credit Agreement, the Debtor shall draw upon the Post-Petition Credit Agreement for the purpose of repaying the Revolving Loans (including all accrued interest, fees, costs and other charges) under the Pre-Petition First Lien Credit Agreement and the Post-Petition Credit Agreement and, to the extent necessary, cash collateralizing existing letters of credit under those agreements (the "<u>Initial Draw</u>").

7. **Agent and Commitment Fee.** Wayzata shall appoint GE Business Financial Services Inc., the administrative agent for the Pre-Petition First Lien Lenders, as administrative agent (in such capacity, the "<u>Agent</u>") for the Lenders under the Post-Petition Credit Agreement. Borrower shall pay Agent, for the ratable account of each Lender providing funds pursuant to the Wayzata Commitment, a fully earned, non-refundable facility fee equal to the following: (i) upon entry of the Interim Order, 1.0% of the Wayzata Commitment and (ii) upon entry of the Final Order, an additional 1.5% of the Wayzata Commitment (collectively, the "<u>Commitment Fee</u>").

8. **Documentation.** In order to document the Post-Petition Credit Agreement, Borrower shall execute and deliver a credit agreement and any other documentation that Agent and Lenders deem necessary and appropriate (collectively, the "<u>Post-Petition Documents</u>"), in each case in form and substance acceptable to the parties. The Post-Petition Documents shall also include the Interim Order and the Final Order.

9. **Maturity Date.** As more fully set forth in the Post-Petition Credit Agreement, the Post-Petition Debt shall mature and be due and payable in full 120 days after the Filing Date or, if earlier, the effective date of a confirmed plan of reorganization or the sale of all or substantially all of the Collateral pursuant to section 363 of the Bankruptcy Code.

WHD/6545410.14

10.    **Payment.**  Borrower shall be obligated to repay all amounts due and owing as follows:

    a.    <u>Principal</u>.  In the absence of an Event of Default, all outstanding advances under the credit facility shall be due at the Maturity Date.

    b.    <u>Interest</u>.   Interest shall accrue and, absent an Event of Default, be due and payable in full at Maturity.  The default rate shall be 2% over and above the non-default rate.

    c.    <u>Fees, Costs, and Charges</u>.  The Agent and the Lenders will be entitled to reimbursement by Borrower for payment all reasonable, out-of-pocket fees, costs, and expenses (including, without limitation, reasonable fees and disbursements of counsel, reasonable consultant costs and expenses, filing and recording fees, and costs and expenses associated with due diligence, travel, appraisals, valuations, audits, and syndication) (the "<u>Expenses</u>") incurred by or on their behalf in connection with preparation of the Post-Petition Credit Agreement.  The Borrower shall promptly pay such Expenses, and in any case no later than two (2) business days from submission.

    d.    <u>Exit Fee</u>. Upon termination, repayment or refinancing in full of the Post-Petition Credit Agreement, the Borrower shall pay Agent, for the ratable benefit of each Lender participating in the Wayzata Commitment, a fully earned, non-refundable exit fee equal to 2% of the Wayzata Commitment (the "<u>Exit Fee</u>").  The Exit Fee may be waived by Lenders in their sole discretion.

    e.    <u>Payments after an Event of Default</u>.  Upon the occurrence and during the continuance of an Event of Default, all unpaid principal, interest, default interest, fees, charges, costs, assessments, reasonable attorneys' fees and costs, and any other sums provided for in the Loan Documents shall, upon notice to the Borrower from the Agent acting at the direction of [Required] Lenders under the Post-Petition Credit Agreement, become accelerated and immediately due and owing.

11.    **Approved Budget.**  Following the Interim Draw, each subsequent draw (each, a "<u>Draw</u>") shall be conditioned upon, among other things, (i)  compliance, subject to certain Permitted Variances, with an approved thirteen (13) week cash flow budget (the "<u>Approved Budget</u>"), in a manner satisfactory to Lenders; and (ii) the absence of a default or Event of Default continuing and the accuracy in all material respects of all representations and warranties set forth in the Post-Petition Documents.

12.    **Interest Rate.**  The obligations under the Post-Petition Credit Agreement shall bear interest at a per annum rate equal to:  (a) the Base Rate plus 5% or, if a LIBOR Loan is elected, LIBOR plus 6.75% for Revolving Loans; (b) the Base Rate plus 5.5% or, if a LIBOR Loan is elected, LIBOR plus 7.25% for the Term

Loan A (as defined therein), which loan shall be drawn for purposes of the roll-up, referenced above, of term loans under the Pre-Petition First Lien Credit Agreement; and (c) LIBOR plus 9% for the other loans under the Post-Petition Credit Agreement.  "Base Rate" means a variable rate equal to the greater of (i) the federal funds rate plus 0.5% and (ii) the prime rate.  "LIBOR" generally is determined with respect to a 2 or 3 month interest period, as elected by Debtor, but is subject to a floor of 3%.  If an Event of Default is continuing under the Post-Petition Credit Agreement, obligations thereunder shall be subject to a default rate of interest equal to the per annum rate otherwise applicable plus 2% per annum.

13.  **Security.**  As security for all of Borrower's obligations under the Post-Petition Credit Agreement, Borrower and each Guarantor will grant the Agent (for its benefit and the benefit of the Lenders) a valid and perfected superpriority security interest in, and lien on, all Collateral (as defined below) of the Borrower pursuant to section 364 the Bankruptcy Code (the "DIP Liens"), with such lien being senior and prior in all respects to any other lien of any kind, except the liens and security interest (the "Pre-Petition Senior Liens") securing the pre-petition indebtedness of the Borrower under the Pre-Petition First Lien Credit Agreement, which First Lien Lenders' Pre-Petition Senior Liens shall be secured equally and ratably with the DIP Liens.

As used herein, the term "Collateral" shall include all of the Debtor's respective pre-petition and post-petition real and personal, tangible and intangible property and assets of any kind or nature whatsoever, whether now owned or hereafter acquired by any Debtor and all proceeds, rents or profits thereof.  The Collateral shall not include avoidance actions but, subject to entry of the Final Order, shall include the proceeds of avoidance actions.

## Carve-Out

The liens and superpriority claims granted to the Lenders with respect to the Post-Petition Credit Agreement  shall be subject and subordinate to, following the occurrence and during the pendency of a Carve-Out Event (as defined below), (a) a carve-out of $1,000,000 for the allowed fees and expenses of the respective retained professionals of the Debtor and the Creditors' Committee (exclusive of any retainers on deposit with retained professionals) incurred after such Carve-Out Event, (b) quarterly fees required to be paid pursuant to 28 U.S.C. § 1930(a)(6), (c) costs of administration of the chapter 11 estate that have been incurred as of the Carve Out Event Notice in accordance with the Approved Budget, but not yet paid, and (d) any fees payable to the Clerk of the Bankruptcy Court and any agent thereof, plus all fees and expenses of the kind described in the foregoing clauses (a), (b) and (d) of this paragraph incurred prior to a Carve-Out Event but not yet paid to the extent such fees and expenses are approved and allowed by the Bankruptcy Court (collectively, the "Carve-Out"), subject to the rights of the Agent, the Post-Petition Lenders, and any other party in interest to object to the award of any such fees and expenses.

WHD/6545410.14

Prior to a Carve-Out Event, the Debtor shall be permitted to pay compensation and reimbursement of expenses authorized to be paid under sections 330 and 331 of the Bankruptcy Code or otherwise pursuant to an order of this Court, as the same may be due and payable, and such payments shall not reduce the Carve-Out. Upon the first date on which the Agent is entitled to exercise remedies under the Post-Petition Credit Agreement and provides notice thereof to the Debtor (the "Carve-Out Event Notice"), the right of the Debtor to pay professional fees outside the Carve-Out shall terminate (a "Carve-Out Event"), and, upon such occurrence, the Debtor, after receipt of the Carve-Out Event Notice from the Agent, shall provide immediate notice by facsimile to all professionals informing them that a Carve-Out Event has occurred and further advising them that the Debtor' ability to pay professionals is subject to the Carve-Out.

14.    **Superpriority Administrative Claims.**  The claims arising under or in connection with the Post-Petition Credit Agreement (the "DIP Claims") shall constitute allowed administrative expense claims senior in priority to any pre-petition or post-petition claim, and shall have priority over all other costs and expenses of administration of any kind, including those specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114 or any other provision of the Bankruptcy Code or otherwise and be payable from, and have recourse to, all assets and property of the Debtor including, subject to entry of the Final Order, the avoidance actions and proceeds thereof.  The DIP Claims shall be subject to the Carve-Out.

15.    **Adequate Protection.**  As adequate protection for the interests of the Pre-Petition First Lien Lenders, including the use of cash collateral by the Debtor prior to the entry of the Final Order, the lenders under the Pre-Petition First Lien Credit Agreement, on account of the Pre-Petition Senior Liens, shall receive the following:

- Replacement liens on all Collateral, with priority equal and ratable to the DIP Liens;

- To the extent such replacement liens are insufficient to provide adequate protection, adequate protection claims arising under section 507(b) of the Bankruptcy Code, which claims shall be *pari passu* to the DIP Claims, and be payable from and have recourse to all assets and property of the Debtor including, subject to entry of the Final Order, the avoidance actions and proceeds thereof; and

- Payment of interest, reasonable fees and expenses of counsel to the Administrative Agent under the Pre-Petition First Lien Credit Agreement.

For the avoidance of doubt, the Pre-Petition Senior Liens shall remain in full force and effect, and shall have priority equal and ratable to the DIP Liens in all respects.

WHD/6545410.14

As adequate protection for the interests of Pre-Petition Second Lien Lenders, the Pre-Petition Second Lien Lenders will be granted a second priority replacement lien on the Collateral.  As between the Pre-Petition First Lien Lenders on the one hand, and the Pre-Petition Second Lien Lenders on the other hand, the second priority replacement liens and other adequate protection rights granted to the Pre-Petition Second Lien Lenders shall be junior in priority to all Replacement Liens and other adequate protection rights granted to the Pre-Petition First Lien Lenders, and the second priority replacement liens and other adequate protection rights granted to the Second Lien Lenders shall be subject in all respects to the terms and provisions of the Intercreditor Agreement.  The Interim and Final Orders provide that the Intercreditor Agreement is a valid and binding subordination agreement within the meaning of section 510 of the Bankruptcy Code that is enforceable according to its terms.  In furtherance of the foregoing, the Debtor's obligations arising under the Post-Petition Credit Agreement or in favor of the Lenders are deemed to be included within the meaning of the "First Lien Obligations" as that term is defined in the Intercreditor Agreement.

16.     **Covenants, Representations and Warranties.**  The Loan Documents shall contain usual and customary affirmative and negative covenants as deemed appropriate by the Lenders, including, without limitation, cash management system, adherence to an approved budget, weekly budget and variance reports, and maximum capital expenditures, each acceptable to Agent and Lenders.  The Loan Documents shall also contain usual and customary representations and warranties for facilities of this type, including, without limitation, corporate existence, corporate power and authority, taxes, ERISA, ownership of property, liens and entry and proper service of the Interim Order and Final Order.

17.     **Conditions Precedent.**  The Post-Petition Documents will contain usual and customary conditions to each draw under the Post-Petition Credit Agreement for facilities of this type.  The Post-Petition Documents will also be subject to the agreement by the Debtor to a detailed term sheet for the Asset Purchase Agreement (as defined below) acceptable to the Debtor.

18.     **Sale Process and Case Milestones.**  The Post-Petition Documents shall contain the following covenants relative to a sale process:

    a.     Sale Motion.  The Debtor shall file a sales procedures motion requesting to sell substantially all of its assets pursuant to section 363 of the Bankruptcy Code (the "Sale Motion") no later than twenty (20) days after commencement of this case.  The Sale Motion shall be in a form acceptable to Post-Petition Agent and the Required Lenders (as defined in the Post-Petition Credit Agreement) and shall be heard and approved within forty-five (45) days of commencement of this case pursuant to an order acceptable to Post-Petition Agent and the Required Lenders (the "Sale Order").

    b.     Asset Purchase Agreement.  In connection with the Sale Motion and not later than twenty (20) days after the commencement of the case, the

Debtor and an affiliate of Wayzata (the "Purchaser") shall negotiate and execute an Asset Purchase Agreement (the "APA"), subject to court approval. The APA shall contain a purchase price (the "Purchase Price") equal to the sum of: (i) the outstanding balance on the Post-Petition Credit Agreement (including all accrued interest and fees), plus any unpaid Obligations under the Pre-Petition Credit Agreement (to the extent not refinanced under the Post-Petition Credit Agreement); (ii) the replacement or assumption of letters of credit under the Pre-Petition First Lien Credit Agreement; (iii) the costs of administration of the chapter 11 estate that have been incurred as of the closing date of the sale approved in the Sale Order; (iv) the obligations of the Debtor under employee health and benefit plans that were incurred during the chapter 11 proceeding in the ordinary course of business, but remain unpaid, (v) the reasonable fees and expenses necessary to wind down the Debtor's bankruptcy estate not to exceed $7 million; and (vi) the cure costs for contracts and leases assumed by the Purchaser in its sole discretion. Pursuant to the APA, the Purchaser will assume contracts, leases and liabilities in its sole discretion, but shall not reduce the Purchase Price on account of obligations that it is required to assume by operation of law.

c.     Stalking Horse Bidder. The Sale Motion and Sale Order shall identify the Purchaser as the stalking horse bidder (the "Stalking Horse") and include provision for payment of a breakup fee equal to three (3) percent of the Purchase Price (the "Breakup Fee"). The Debtor will pay the Purchaser's reasonable fees and expenses (subject to a cap of $1,000,000) incurred in connection with drafting the APA and the sale process, but such expense, if paid, will be counted toward the Breakup Fee.

d.     Auction and Bidding. The Sale Order shall provide for the Debtor to conduct an auction (the "Auction") not more than eighty (80) days after the commencement of the Case. At the Auction, there shall be an initial minimum cash overbid equal to the Purchase Price, plus the Breakup Fee, plus Purchaser's reasonable fees and expenses (the "Minimum Overbid"). Each subsequent bid after the Minimum Overbid shall increase in cash increments of at least $500,000. Each bid shall be done on terms that conform to the APA.

e.     Approval Hearing. The approval hearing shall occur within twenty four (24) hours of the conclusion of the Auction and shall result in entry of a sale order (the "Sale Order") acceptable to the Lenders, the prevailing bidder and the Debtor. The Sale Order shall contain customary terms and conditions for auctions conducted pursuant to section 363 of the Bankruptcy Code.

f.     Plan of Reorganization. The Debtor shall file a liquidating plan of reorganization and disclosure statement with the Bankruptcy Court by no later than 180 days after commencement of this case, and seek

WHD/6545410.14

confirmation of such plan within 210 days after commencement of this case.

19. **Attorneys' Fees and Costs.** Borrower has agreed to promptly pay the reasonable Expenses incurred by Wayzata, Lenders and Agent in connection with the negotiation, drafting and execution of the Post-Petition Documents, regardless of whether any transaction contemplated herein is ever actually consummated. Borrower has paid $125,000 of Wayzata's $200,000 non-refundable work fee (the "Work Fee") that will be applied toward Wayzata and Lenders' legal fees, costs and expenses. The Work Fee is a non-refundable deposit and is not meant to be a cap or limit on any expenses incurred by Wayzata and Lenders.

20. **Section 506(c) Waiver.** Subject to entry of the Final Order, the Debtor shall waive any and all rights to surcharge the Collateral pursuant to section 506(c) of the Bankruptcy Code.

21. **No Adverse Actions.** No proceeds of any extensions of credit under the DIP Facility or any Collateral proceeds may be used to commence or prosecute or join in any action against or adverse to the interests of Agent or any Lender; provided, however, that the foregoing shall not apply to costs and expenses, in an amount not to exceed $25,000, incurred by the Committee's professionals in connection with a potential challenge to the extent, validity, perfection, priority or enforceability of the Pre-Petition Liens, in accordance with the Interim Order.

## **The Debtor's Urgent Need for Postpetition Financing**

20. The Debtor has an immediate need for post-petition financing under the Post-Petition Credit Agreement to continue to finance its post-petition operations and pay administrative expenses. Such financing is critical to preserve the going concern value of the Debtor's assets, thereby maximizing the returns to all creditors and stakeholders that will be obtained from the contemplated sale of the Debtor's assets.

21. Because all of the Debtor's assets are encumbered by the pre-petition liens and security interests of the Pre-Petition Lenders, the Debtor has no unencumbered funds with which to pay ongoing wages, salaries and day-to-day operating expenses, including, but not limited to, rent and utility obligations, all of which are vital to sustain normal course of business operations. Due to the nature and magnitude of the Debtor's operations, which are dependent upon uninterrupted access to necessary working capital, the Debtor's immediate access to the Post-

WHD/6545410.14

Petition Credit Agreement is essential to prevent irreparable harm to the Debtor's estates.  The

Post-Petition Credit Agreement also is necessary to provide assurance to employees, landlords,

utilities and other parties that they will be paid on a timely basis for post-petition services.

Without the Post-Petition Credit Agreement, the Debtors' day-to-day operations would come to a

halt, a result that would be devastating to the Debtor's attempt to maximize the value of its assets

through an expedited sale process.

### The Proposed Post-Petition Credit Agreement
### is the Only Viable Financing Alternative

22.     As the Debtor's financial condition continued to deteriorate in the weeks leading

up to the Petition Date, it became increasingly clear that the Debtor had only two possible

sources of post-petition financing the Post-Petition Lenders and DDJ Capital Management, LLC

("DDJ").  Notwithstanding an exhaustive – but ultimately fruitless – search over a two year

period for replacement facilities for its Pre-Petition First Lien Lenders' and Pre-Petition Second

Lien Lenders' facilities, it became clear that the Debtor would need to obtain postpetition

financing on an accelerated timetable.  In an effort to maximize value while preserving the

Debtor's business as a going concern, and given the tight timing requirements of the postpetition

financing, the complexity of the Debtor's capital structure and the need to secure financing to

support the prompt sale of the company, it was not only prudent but ultimately necessary to

focus on two key parties – the Post-Petition Lenders and DDJ.  The Post-Petition Lenders and

DDJ emerged as the most likely candidates to purchase the Debtor's assets, and each has

extensive knowledge of and familiarity with the Debtor's assets and operations.

23.     After intensive review and negotiation, the Debtor determined that the proposal

by the Post-Petition Lenders contained the most favorable terms to effectively address the

Debtor's working capital and liquidity requirements, and that the Purchaser's proposed term

WHD/6545410.14

sheet for the purchase of substantially all of the Debtor's assets represented the most viable

option for maximizing the value of the estate through a sale of assets.

24.     The Debtor also considered the interplay between the Pre-Petition First Lien

Lenders and the Pre-Petition Second Lien Lenders, and the prospects for protracted and

expensive internecine litigation.  Virtually all of the Debtor's assets are encumbered by liens and

security interests granted to the Pre-Petition First Lien Lenders and the Pre-Petition Second Lien

Lenders.  Thus, even if alternative debtor-in-possession financing, such as that proposed by DDJ,

was available on favorable terms and conditions and could be consummated in a time frame

required to address the Debtor's immediate liquidity needs, obtaining such financing is expected

to result in a difficult and protracted contest concerning the use of cash collateral with the Pre-

Petition First Lien Lenders, the results of which could not be predicted with certainty and may

cause the customers to stop providing extraordinary financial support in the form of Customer

Accommodation Agreements.  Further, the Debtor submits that its agreement to repay the Pre-

Petition First Lien Debt with proceeds of the Post-Petition Debt, as set forth herein and in the

Post-Petition Credit Agreement, is necessary in order to maintain the Pre-Petition First Lien

Lenders' support of the DIP Financing and avoid litigation regarding adequate protection of the

interests of the Pre-Petition First Lien Lenders.  In addition, the Debtor submits that the

repayment of the Pre-Petition First Lien Debt is consistent with the Bankruptcy Code and that

the amount of the proposed repayment does not exceed the value of the Prepetition Collateral.

Any uncertainty occasioned by protracted financing litigation regarding any of the foregoing

issues, among others, would be extremely damaging to the Debtor, immediately jeopardizing its

chapter 11 case at the outset.

25.     Thus, the Debtor was unable to obtain alternative post-petition financing through

credit allowable as an administrative expense, or credit secured by liens on the Debtor's assets

junior to the existing liens.  In these circumstances, the Debtor, in the exercise of its considered

business judgment and in consultation with its professional advisors, determined that the

financing provided by the Post-Petition Credit Agreement is the most favorable under the

circumstances and provides the Debtor the liquidity necessary to maintain the going concern

value of its business pending the conclusion of the Debtor's proposed sale process.

26.     The Post-Petition Credit Agreement, which is the product of good faith, arm's-

length negotiations between the Post-Petition Lenders and the Debtor, provides the Debtor with

continued financing pursuant to (i) the terms of the Post-Petition Agreement, (ii) the Approved

Budget attached hereto as "Exhibit C," and (iii) the terms of the proposed Interim Order in the

form attached hereto as "Exhibit A" (pending approval of the Post-Petition Credit Agreement on

a permanent basis at the Final Hearing).

27.     This relief will enable the Debtor to accomplish its strategic restructuring goals,

successfully complete a sale process and consummate a value-maximizing transaction. As of the

Petition Date, the Debtor's Pre-Petition First Lien Lenders have agreed to the Debtor's use of

cash collateral only for the purpose of repaying the Pre-Petition First Lien Debt as set forth

herein.  As such, the Debtor is facing a liquidity crisis and needs immediate access to credit

under the Post-Petition Credit Agreement to fund working capital and certain other costs pending

a sale transaction. Absent this new liquidity, not only would the Debtor's ability to maximize the

value of its estate and successfully preserve asset values be jeopardized, but the Debtor also

could be forced to immediately and abruptly cease operations at its facilities to the direct

detriment of all the Debtor's stakeholders, including the automotive manufacturers (including

General Motors, Ford, Chrysler, Honda and Toyota) and the construction and agricultural

manufacturers (including Caterpillar, John Deere and Borg Warner) which rely on the Debtor's

ability to manufacture high quality cast parts, as well as the Debtor's employees, customers, vendors and landlords.

28.    Accordingly, without immediate access to postpetition financing, the Debtor would suffer immediate, substantial and irreparable harm, which could threaten its ability to successfully consummate a sale transaction and preserve going concern value.  By contrast, once the Post-Petition Credit Agreement is approved, the Debtor's ability to minimize disruption to its business and instill confidence in its various stakeholders will be substantially enhanced.  The Debtor's need for access to the DIP Credit Facility, therefore, is urgent.  In addition, because the Debtor has no unencumbered funds to meet certain imminent expenses necessary both to preserve value pending a sale transaction and to facilitate a smooth transition to chapter 11, it is essential for the Debtor to obtain interim financing under the Post-Petition Credit Agreement pending the Final Hearing.

### The Debtor's Entry into the Post-Petition Credit Agreement Is Authorized under Section 364 of the Bankruptcy Code

29.    Section 364 of the Bankruptcy Code distinguishes among (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit out of the ordinary course of business and (c) obtaining credit with specialized priority or with security.  If a debtor-in-possession cannot obtain postpetition credit on an unsecured basis, pursuant to section 364(c) of the Bankruptcy Code,[5] a court may authorize the obtaining of credit or the incurring of debt,

---

[5]  Section 364(c) of the Bankruptcy Code provides as follows:

(c)  If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt

(1)  with priority over any or all administrative expenses of the kind specific in section 503(b) or 507(b) of this title;

(2)  secured by a lien on property of the estate that is not otherwise subject to a lien; or

(3)  secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

WHD/6545410.14

repayment of which is entitled to superpriority administrative expense status or is secured by a

senior lien on unencumbered property or a junior lien on encumbered property, or a combination

of the foregoing.

30.    Because the Debtor proposes to obtain financing under the Post-Petition Credit

Agreement that is secured by both priming and non-priming liens, the approval of the Post-

Petition Credit Agreement is governed by both sections 364(c) and 364(d) of the Bankruptcy

Code.

31.    The statutory requirement for obtaining postpetition credit under section 364(c) of

the Bankruptcy Code is a finding, made after notice and hearing, that the debtor-in-possession is

"unable to obtain unsecured credit allowable under § 503(b)(1) of [the Bankruptcy Code] as an

administrative expense." See In re Ames Dept Stores, Inc., 115 B.R. 34, 37 n.3 (Bankr. S.D.N.Y.

1990) (a debtor must show that it has made a reasonable effort to seek other sources of financing

under sections 364(a) and (b) of the Bankruptcy Code); In re Crouse Group, Inc., 71 B.R. 544,

549 (Bankr. E.D. Pa. 1987) (debtor seeking secured credit under section 364(c) of the

Bankruptcy Code must prove that it was unable to obtain unsecured credit pursuant to

section 364(b) of the Bankruptcy Code), modified on other grounds, 75 B.R. 553 (Bankr. E.D.

Pa. 1987).

32.    Courts have articulated a three-part test to determine whether a debtor may obtain

financing under section 364(c) of the Bankruptcy Code:

(a)    the debtor is unable to obtain unsecured credit under section 364(b)
(i.e., by granting a lender administrative expense priority);

(b)    credit transaction is necessary to preserve the assets of the estate; and

(c)    the terms of the transaction are fair, reasonable and adequate, given the
circumstances of the debtor-borrower and the proposed lender.

20

In re Aqua Assocs., 123 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991) (applying the above test and

holding that "[o]btaining credit should be permitted not only because it is not available

elsewhere, which could suggest the unsoundness of the basis for the use of the funds generated

by credit, but also because the credit acquired is of significant benefit to the debtor's estate and

the terms of the proposed loan are within the bounds of reason, irrespective of the inability of the

debtor to obtain comparable credit elsewhere"); In re Ames Dep't Stores, 115 B.R. at 37-39.

       33.      The Debtor also seeks approval of the Post-Petition Credit Agreement under

section 364(d)(1) of the Bankruptcy Code. The statutory requirement for obtaining postpetition

credit under section 364(d)(1) of the Bankruptcy Code is a finding, made after notice and

hearing, that the debtors in possession are "unable to obtain such credit otherwise." See Shaw

Indus., Inc. v. First Nat'l Bank of PA (In re Shaw Indus., Inc.), 300 B.R. 861, 863, 865 (Bankr.

W.D. Pa. 2003) (where debtor made efforts by "contacting numerous lenders" and was unable to

obtain credit without a priming lien, it had met its burden under section 364(d)); In re Dunes

Casino Hotel, 69 B.R. 784, 796 (Bankr. D. N.J. 1986) (holding that the debtor had made required

efforts under section 364(d)(1) of the Bankruptcy Code based on evidence that the debtor had

attempted unsuccessfully to borrow funds on an unsecured basis or secured by junior liens, but

that at least three such lenders were willing to advance funds secured by a superpriority lien).  In

addition, the secured creditors whose liens are being "primed" by a new postpetition lender

under section 364(d) of the Bankruptcy Code must be provided with adequate protection of their

interests in collateral.  See Resolution Trust Corp. v. Swedeland Dev. Group, Inc.

(In re Swedeland Dev. Group, Inc.), 16 F.3d 552, 564 (3d Cir. 1994) (en banc) (noting that

adequate protection is required under section 364(d)(1)(B) of the Bankruptcy Code to ensure that

the creditor receives the value for which it bargained pre-bankruptcy); In re Dunes Casino,

69 B.R. at 793 (holding that "[a]dequate protection is designed to preserve the secured creditor's

position at the time of the bankruptcy").

34.     Against this statutory backdrop, courts will evaluate the facts and circumstances

of a debtor's case and accord significant weight to the necessity of obtaining the financing.

In re Ames Dep't Stores, 115 B.R. at 40.  Debtors are generally permitted to exercise their

business judgment consistent with their fiduciary duties when evaluating the necessity of

proposed protections for a party extending credit under section 364 of the Bankruptcy Code.

Trans World Airlines v. Travellers Int'l AG. (In re Trans World Airlines, Inc.), 163 B.R. 964,

967 (Bankr. D. Del. 1994)(noting that an interim loan, receivables facility and asset-based

facility were approved because they "reflect[ed] sound and prudent business judgment…[were]

reasonable under the circumstances and in the best interest of [the debtor] and its creditors").

35.     To show that the credit required is not obtainable on an unsecured basis, a debtor

need only demonstrate "by a good faith effort that credit was not available without" the

protections of sections 364(c) of the Bankruptcy Code.  Bray v. Shenandoah Fed. Sav. & Loan

Ass'n (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986).  Thus, "[t]he statute imposes

no duty to seek credit from every possible lender before concluding that such credit is

unavailable." Id. at 1088; see also, In re Ames Dep't Stores, 115 B.R. at 40 (holding that debtor

made a reasonable effort to secure financing where it approached four lending institutions, was

rejected by two, and selected the least onerous financing option from the remaining two lenders).

Moreover, where few lenders are likely to be able and willing to extend the necessary credit to

the debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct an

exhaustive search for financing." In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga.

1988), affd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc., 99 B.R. 117, 120 n.4 (N.D. Ga.

1989).

36.     The Debtor believes that the Post-Petition Credit Agreement is the best financing arrangement available.  The Debtor respectfully submits that its efforts to seek necessary postpetition financing from the Post-Petition Lenders satisfy the statutory requirements of section 364 of the Bankruptcy Code.

***The Post-Petition Credit Agreement is Necessary to Preserve Assets of the Debtor's Estate***

37.     The United States Supreme Court has articulated two basic purposes of Chapter 11:  (1) "preserving going concerns" and (2)"maximizing property available to satisfy creditors."[6]  It is essential that the Debtor immediately obtain financing necessary to continue, among other things, certain key components of the Debtor's business and to make certain capital expenditures and satisfy certain working capital requirements of the Debtor's business pending a sale transaction. The Post-Petition Credit Agreement also is essential to continue and to maintain the Debtor's relationships with its various stakeholders, including customers, employees, suppliers, and dealers and other key constituencies pending a sale.

38.     The Debtor commenced this case to implement an expeditious sale process with the Purchaser or a similar transaction with a competing bidder, which is designed to maximize the value of the Debtor's operations and businesses for the benefit of its stakeholders. To achieve these goals, the Debtor must protect and preserve its business assets and going concern value pending the completion of a sale (a "Sale Transaction") through a prompt and organized sale process and related relief necessary to preserve the enterprise (collectively, the "Sale Process").

39.     Thus, approval of interim borrowing under the Post-Petition Credit Agreement is crucial to maximizing the value of the Debtor's estate.

***The Terms of the Post-Petition Credit Agreement Are Fair, Reasonable and Adequate***

---

[6] Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship, 526 U.S. 434, 453 (1999).

23

40.     The terms and conditions of the Post-Petition Credit Agreement are fair,

reasonable and adequate, and were negotiated by the parties in good faith and at arm's-length.

The Debtor, in the reasonable exercise of its business judgment, determined that the Post-Petition

Credit Agreement is the best financing option available under the circumstances, and that the

pricing and other economic terms are fair, reasonable and consistent with market practice.

Likewise, the various fees and charges required by the Post-Petition Lenders under the Post-

Petition Credit Agreement are reasonable and appropriate under the circumstances.  Indeed,

courts routinely authorize similar lender incentives beyond the explicit liens and rights specified

in section 364 of the Bankruptcy Code.  See, e.g., Resolution Trust Corp. v. Official Unsecured

Creditors Comm. (In re Defender Drug Stores), 145 B.R. 312, 316 (9th Cir. BAP 1992)

(approving financing facility pursuant to section 364 of the Bankruptcy Code that include a

lender "enhancement fee").

41.     The Debtor carefully considered proposals from both the Post-Petition Lenders

and DDJ, and ultimately chose the Post-Petition Lenders' proposal because it has the support of

the Pre-Petition First Lien Lenders, who are the important and influential creditors in this case,

both by virtue of their legal rights against the Debtor, and through the rights the Pre-Petition

Second Lien Lenders ceded to the Pre-Petition First Lien Lenders in the Intercreditor

WHD/6545410.14

Agreement.[7]  Moreover, the Post-Petition Lenders' proposal is accompanied by a definitive

Letter of Intent by a stalking horse purchaser of the Debtor's assets which provides certainty

with respect to the ability of the Debtor's business to continue as a going concern and prevents

the case from floundering amidst an internecine dispute between the senior lenders.

### Application of the Business Judgment Standard

42.     As described above, the Post-Petition Credit Agreement provides the only

alternative available under the circumstances presented by this chapter 11 case.  Bankruptcy

courts routinely defer to a debtor's business judgment on most business decisions, including the

decision to borrow money, unless such decision is arbitrary and capricious.  See Trans World

Airlines v. Travelers Int'l AG (In re Trans World Airlines, Inc.), 163 B.R. 964, 974 (Bankr. D.

Del. 1994) (noting that the interim loan, receivables facility and asset-based facility were

approved because they "reflect[ed] sound and prudent business judgment on the part of TWA . . .

[were] reasonable under the circumstances and in the best interest of TWA and its creditors").  In

fact, "[m]ore exacting scrutiny would slow the administration of the Debtor's estate and increase

its cost, interfere with the Bankruptcy Code's provision for private control of administration of

the estate, and threaten the court's ability to control a case impartially."  Richmond Leasing Co.

v. Capital Bank, N.A., 762 F.2d 1303, 1311 (5th Cir. 1985).

---

[7]  Section 510(a) of the Bankruptcy Code provides that a subordination agreement, like the Intercreditor Agreement,
is enforceable in bankruptcy "to the same extent that such agreement is enforceable under applicable
nonbankruptcy law."  In the instant case, the applicable law is the law of Illinois.  In Illinois, subordination
agreements are clearly enforceable.  810 Ill. Com. Stat. 5/1-310.  (…"a creditor may subordinate its right to
performance of an obligation by agreement with either the person obligated or another creditor of the person
obligated).  Illinois law provides that, in the absence of ambiguity, the terms of subordination agreements are to
be construed according to their plan language.  Marriott Family Restaurants, Inc. v. Lunan Family Restaurants
(In re Lunan Family Restaurants), 194 B.R. 429, 445 (Bankr. N.D. Ill. 1996).  Here, the Intercreditor Agreement
unambiguously provides that the Pre-Petition Second Lien Lenders are so-called "silent seconds," who have
waived their rights to object to actions taken by the Pre-Petition First Lien Lenders, including waivers with
respect to debtor-in-possession financing, use of cash collateral, rights to adequate protection, and the conduct of
a section 363 sale of the Debtor's assets.  (Intercreditor Agreement, § 6 ("Bankruptcy Matters").)

43.    The Debtor respectfully submits that it has exercised sound business judgment[8] in determining that a postpetition credit facility is appropriate, and has satisfied the legal prerequisites to incur debt under the Post-Petition Credit Agreement. The terms of the Post-Petition Credit Agreement are fair and reasonable, and are in the best interests of the Debtor's estate. Accordingly, the Court should grant the Debtor authority to enter into the Post-Petition Credit Agreement and obtain funds from the Lenders on the secured and administrative "superpriority" basis described above, pursuant to section 364(c) of the Bankruptcy Code.

### Use of Cash Collateral and Proposed Adequate Protection Should be Approved

44.    Pursuant to section 363(c)(2) of the Bankruptcy Code, a debtor in possession may not use cash collateral unless "(a) each entity that has an interest in such cash collateral consents; or (b) the court, after notice and a hearing, authorizes such use … in accordance with the provisions of this section." 11 U.S.C. §363(c)(2).  In addition, section 363(e) of the Bankruptcy Code provides that "on request of an entity that has an interest in property used … or proposed to be used … by a [debtor in possession], the court, with or without a hearing, shall prohibit or condition such use … as is necessary to provide adequate protection of such interests." 11 U.S.C. §363(e).

45.    Here, the Debtor requires use of cash collateral in connection with the financing provided under the Post-Petition Credit Agreement.  Absent such relief, the Debtor would be unable to generate availability under the Post-Petition Credit Agreement in amounts necessary to

---

[8]  The Debtor is a Wisconsin corporation.  Under applicable Wisconsin law, "[t]he business of a corporation is committed to its officers and directors, and if their actions are consistent with the exercise of honest discretion, the management of the corporation cannot be assumed by the court." Steven v. Hale-Haas Corp., 249 Wis. 205, 221, 23 N.W.2d 620, 628 (1946).  Absent evidence of a "corporate action so patently harmful to the corporation as to indicate an abuse of discretion, this court will not substitute its judgment for that of" corporate decision-makers. Id.  Under the business judgment rule, the law presumes the good faith of the Debtor's decision-makers. Reget v. Paige, 2001 WI App 73, ¶18, 242 Wis. 2d 278, 626 N.W.2d 302. The objecting party, if any, has the burden to present sufficient evidence to overcome that presumption, and the level of proof necessary to meet that burden has been described as a showing of "bad faith, overreaching, self-dealing or any other fraud." Panter v. Marshall Field's Co., 646 F.2d 271, 297-98 (7th Cir. 1981).

WHD/6545410.14

sustain ordinary course of business operations.  Simply stated, without access to cash collateral, the Debtor will not be able to access financing under the DIP Facility, in which event, its operations would be brought to a grinding halt, resulting in immediate and irreparable harm to the Debtor and its stakeholders.

46.     To adequately protect the interests of the Pre-Petition Lenders for the Debtor's use of Cash Collateral, the Debtor proposes to provide such parties with the protections described above and in the Interim Order.  Accordingly, the Debtor's request to use Cash Collateral as provided herein and in the Interim Order should be approved.

### Request for Authority to Make Interim Borrowings Under the Post-Petition Credit Agreement

47.     Pursuant to Bankruptcy Rule 4001(c), the Debtor requests that the Court conduct an interim hearing and authorize the Debtor to borrow, on an interim basis, $10,000,000 in cash under the Post-Petition Credit Agreement in order to (a) implement an expeditious Sale Process; (b) preserve and protect the Debtor's assets pending a Sale Transaction, including by paying claims of suppliers and employees to preserve the going concern value of the Debtor's business; and (c) avoid immediate and irreparable harm and prejudice to the Debtor's estate and all parties in interest.

48.     Bankruptcy Rule 4001(c) provides that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code may not be commenced earlier than 15 days after the service of such motion.  Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate. In examining requests for interim relief under this rule, courts apply the same business judgment standard applicable to other business decisions. See, e.g., In re Simasko Prod. Co., 47 B.R. at 444, 449 (D. Colo. 1985);

WHD/6545410.14

see also In re Ames Dep't Stores, 115 B.R. at 38.  After the 15-day period, the request for

financing is not limited to those amounts necessary to prevent disruption of the debtor's

business, and the debtor is entitled to borrow those amounts that it believes prudent in the

operation of its business. See, e.g., In re Simasko, 47 B.R. at 449; In re Ames Dep't Stores,

115 B.R. at 36.

49.     The Debtor has an urgent and immediate need for cash to fund the activities

necessary to protect and preserve the assets of the Debtor's estate (including the going concern

value of its business).  The Prepetition First Lien Lenders have not, at this time, consented to the

use of cash collateral other than to repay the Pre-Petition First Lien Debt pursuant to the terms

and conditions of the Post-Petition Credit Agreement and the proposed Interim Order, and the

Debtor does not have sufficient unencumbered funds with which to implement an expeditious

Sale Process or preserve and protect its assets pending a Sale Transaction, without access to

postpetition financing.  Absent immediate authorization from the Court to obtain secured credit,

as requested, on an interim basis pending the Final Hearing, the Debtor will be immediately and

irreparably harmed. The availability of interim loans under the Post-Petition Credit Agreement

will provide the necessary assurance to suppliers, dealers, employees and customers, of the

Debtor's ability to meet its near-term obligations.

## **Good Faith**

50.     The terms and conditions of the Post-Petition Credit Agreement are fair and

reasonable and were negotiated by the parties in good faith and at arms' length. Therefore, the

Post-Petition Lenders should be accorded the benefits of section 364(e) of the Bankruptcy Code

to the extent any or all of the provisions of the Post-Petition Credit Agreement, or any interim or

final order of this Court pertaining thereto, are hereafter modified, vacated, stayed or terminated

by subsequent order of this or any other court.

WHD/6545410.14

**Request for Modification of the Automatic Stay**

51.      The Debtor seeks a modification of the automatic stay imposed by operation of section 362 of the Bankruptcy Code to the extent contemplated by the provisions of the Post-Petition Credit Agreement as described above.

52.      Such stay modification provisions are customary features of postpetition financing facilities and, in the Debtor's business judgment, are reasonable under the circumstances. Accordingly, the Debtor respectfully requests that this Court modify the automatic stay to the extent contemplated by the Post-Petition Credit Agreement and the proposed Interim Order.

53.      Pursuant to Bankruptcy Rule 4001(c)(2), the Debtor respectfully requests that this Court set a date for the Final Hearing that is no later than 25 days from the Petition Date, and approve the provisions for notice of such Final Hearing that are set forth in the proposed Interim Order.

**Notice**

54.      Notice of this Motion will be provided via electronic mail, or facsimile, to the parties or their counsel identified on the attached Service List.  Given the nature of the relief requested herein, Debtor submits that no other notice is necessary and asks the Court, pursuant to Fed. R. Bankr. P. 9007, to approve the same.

**No Prior Request**

55.      No prior request for the relief sought in this Motion has been made to this or any other court in connection with these chapter 11 cases.

WHD/6545410.14

WHEREFORE, the Debtor respectfully requests that the Court (a) enter the Interim

Order, granting the interim relief requested herein that is substantially in the form annexed hereto

as Exhibit A; (b) schedule the Final Hearing on or before July ___, 2009; and (c) grant such other

and further relief to the Debtor as the Court may deem proper.

Dated the 30th day of June, 2009.

GREDE FOUNDRIES, INC.,
Debtor and Debtor-in-Possession
by proposed counsel,
Whyte Hirschboeck Dudek S.C.


By:    /s/ Daryl L. Diesing
Daryl L. Diesing
State Bar No. 1005793
Jerard J. Jensen
State Bar No. 1016910
Daniel J. McGarry
State Bar No.1052213

POST OFFICE ADDRESS:
555 East Wells Street, Suite 1900
Milwaukee, WI  53202
Telephone:  (414) 273-2100
Facsimile: (414) 223-5000
Email:  jjensen@whdlaw.com
          ddiesing@whdlaw.com
          dmcgarry@whdlaw.com

WHD/6545410.14

Leverson & Metz S.C.
proposed Special Counsel to the Debtor


By:  /s/ Mark L. Metz

Marl L. Metz
State Bar No. 1001791

<u>POST OFFICE ADDRESS</u>:
225 E. Mason St., Suite 100
Milwaukee, WI  53202
Telephone:  (414) 271-8502 (direct)
Facsimile: (414) 271-8504
Email:  mlm@levmetz.com

31

**SERVICE LIST**

| | |
|---|---|
| ***Debtor and Debtor-in-Possession***<br><br>Grede Foundries, Inc.<br>9898 W. Bluemound Road<br>Milwaukee, Wisconsin 53226<br>Attn: Richard T. Koenings, Chrmn. of the Board<br>e-mail: rkoenings@wi.rr.com<br>Facsimile: (414) 257-4102 | ***Proposed Counsel to Debtor and Debtor-in-Possession***<br><br>Whyte Hirschboeck Dudek S.C.<br>555 East Wells Street, Suite 1900<br>Milwaukee, Wisconsin 53202-3819<br>Attn: Daryl L. Diesing<br>e-mail: ddiesing@whdlaw.com<br>Facsimile: (414) 223-5000 |
| ***Proposed Special Counsel to Debtor and Debtor-in-Possession***<br><br>Leverson & Metz S.C.<br>225 East Mason Street, Suite 100<br>Milwaukee, WI 53202<br>Attn: Mark L. Metz<br>e-mail: mlm@levmetz.com<br>Facsimile: (414) 271-8504 | ***Proposed Claims and Noticing Agent to Debtor and Debtor-in-Possession***<br><br>Kurtzman Carson Consultants LLC<br>2335 Alaska Ave.<br>Los Angeles, CA 90245<br>Attn: Drake Foster<br>          Isidro N. Panizales<br>          Kenneth Chow<br>e-mail: dfoster@kccllc.com<br>          ipanizales@kccllc.com<br>          kchow@kccllc.com<br>Facsimile: (310) 823-9133 |
| ***Office of the United States Trustee for the Western District of Wisconsin***<br><br>U.S. Trustee's Office<br>780 Regent St., Suite 304<br>Madison, WI 53715<br>Attn: Thomas P. Walz, Sheree G. Dandurand<br>e-mail: thomas.p.walz@usdoj.gov<br>          sheree.g.dandurand@usdoj.gov<br>Facsimile: (608) 264-5182 | ***Counsel to GE Business Finance Inc., the Agent for the Senior Secured Lenders***<br><br>Goldberg, Kohn, Bell, Black & Rosenbloom<br>55 E. Monroe Street, Suite 3300<br>Chicago, IL 60603<br>Attn:   Randall L. Klein, Jeremy M. Downs<br>e-mail: randall.klein@goldbergkohn.com<br>          jeremy.downs@goldbergkohn.com<br>Facsimile: (312) 332-2196 |

WHD/6545410.14

| *Counsel for Proposed Debtor-in-Possession Lender Wayzata Investment Partners LLC* | *Counsel to the Agent for DDJ, the Second Lien Secured Creditor* |
|---|---|
| Faegre & Benson<br>2200 Wells Fargo Center<br>90 South Seventh Street<br>Minneapolis, MN 55402-3901<br>Attn: Michael R. Stewart, Michael R. Holden<br>e-mail: mstewart@faegre.com<br>        mholden@faegre.com<br>Facsimile: 612-766-1600 | Milbank, Tweed, Hadley & McCloy LLP<br>1850 K Street, NW, Suite 1100<br>Washington, DC 20006<br>Attn: Debra Alligood White<br>e-mail: dwhite@milbank.com<br>Facsimile: (202) 835-7586<br><br>*- and -*<br><br>von Briesen & Roper, s.c.<br>411 East Wisconsin Avenue<br>Suite 700<br>Milwaukee, WI 53202<br>Attn: Randall D. Crocker<br>e-mail: rcrocker@vonbriesen.com<br>Facsimile: (414) 238-6532 |
| The Debtor's twenty (20) largest unsecured creditors as set forth on the list filed pursuant to Fed. R. Bankr. P. 1007 | Accommodation Agreement Counterparties |

WHD/6545410.14